## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kerry McLain,

                    Plaintiff,

                                        **MEMORANDUM OPINION**
          v.                            **AND ORDER**
                                        Civil No. 06-4389 ADM/JSM
Andersen Corporation,
a Minnesota corporation, and
Andersen Distribution, Inc.,
a Delaware corporation,

                    Defendants.

_____

Charles L. Friedman, Esq., Friedman Law Office, Minneapolis, MN, argued on behalf of
Plaintiff.

David M. Wilk, Esq., Larson King, LLP, St. Paul, MN, argued on behalf of Defendant.

_____

### I. INTRODUCTION

        On February 29, 2008, the undersigned United States District Judge heard oral argument

on Plaintiff Kerry McLain's ("McLain") Motion for Partial Summary Judgment [Docket No.

128] and Defendants Andersen Corporation and Andersen Distribution, Inc.'s (collectively,

"Andersen") Motion for Summary Judgment [Docket No. 78].  For the reasons set forth herein,

McLain's Motion is denied and Andersen's Motion is granted.

### II.  BACKGROUND[1]

**A.      McLain's Employment at Andersen**

        In 1998, McLain began employment as a truck driver in Andersen's Brooklyn Park,

Minnesota, facility.  McLain Dep. (Jan. 15, 2008, Wilk Aff. [Docket No. 126]) Ex. 1 at 23.

_____

        [1] On a motion for summary judgment, the Court views the evidence in the light most
favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

From March 2006 to April 2007, the time period relevant to this litigation, Senior Line Supervisor John Mathias ("Mathias") supervised the drivers and shipping office personnel at Andersen's Brooklyn Park facility. Mathias Dep. (Jan. 15, 2008, Wilk Aff. Ex. 15) at 8-10. Mathias's direct supervisor was Plant Manager Tom Rustad ("Rustad"). Id. Rustad reported to Center Manager Stephen French ("French"). Mathias Dep. at 10; French Dep. (Jan. 15, 2008, Wilk Aff. Ex. 14) at 8-10.

McLain is licensed to drive Class B trucks, trucks shorter than twenty-six feet in length. French Dep. at 66-67. Until late March 2006, McLain's job was primarily to drive Class B trucks to Home Depot stores and unload Andersen's products, such as windows and patio doors, onto flat loading docks. McLain Dep. at 53-54. McLain occasionally delivered Andersen's products to lumberyards and job sites. Mathias Dep. at 28; French Dep. at 87-88. A job site is a new home or commercial construction site. McLain Dep. at 51. Because job sites do not have flat loading docks, the driver must carry products down an inclined ramp extending from the truck to the ground. Id. at 51-52. The driver is often required to carry products across uneven terrain before placing them at the job site. Id. at 51-52.

In March 2006, as part of a nationwide initiative to reduce fuel costs and improve delivery times to Home Depot stores, French, Rustad, and Mathias decided to use only longer Class A vehicles, such as semi tractor-trailers, for deliveries to Home Depot stores. French Dep. at 93-95; Mathias Dep. at 27-28. Mathias informed the Brooklyn Park drivers of the changes and modified their delivery routes accordingly. Mathias Dep. at 30. In late March or early April 2006, Mathias and McLain discussed the scheduling changes. Id. at 46. Mathias discussed the possibility of McLain obtaining a Class A license to drive a potential evening shift to Home

2

Depot stores, but McLain declined because of family responsibilities.  Mathias Dep. at 46, 153-54; McLain Dep. at 64.  McLain told Mathias that the change to Class A trucks would not be cost-efficient.  McLain Dep. at 63-66.  McLain claims Mathias responded that drivers who disagreed with the changes could "hit the fucking road."  Id. at 67.

Beginning in late March or early April 2006, McLain began making deliveries exclusively to lumberyards and job sites.  Id. at 71.  Because of an injury he had suffered in August 1985, McLain experienced pain in his right knee when he carried products down his truck ramp and on uneven surfaces at job sites.  Id. at 71-72.  In 1987, Dr. Philip Haley ("Dr. Haley"), an orthopedic physician, had diagnosed McLain's 1985 knee injury as a permanent three-percent impairment to the body.  Jan. 15, 2008, Wilk Aff. Ex. 6.  Neither Mathias nor anyone else at Andersen was aware of McLain's preexisting knee injury.  McLain Dep. at 67.

On May 4, 2006, McLain consulted with Dr. William Fox ("Dr. Fox"), who signed a report of work ability stating that McLain would be unable to work until he consulted with an orthopedic doctor.  Jan. 15, 2008, Wilk Aff. Ex. 2.  Dr. Fox's report listed the following restrictions: "No lifting.  No [s]quat."  Id. Ex. 2.  McLain faxed a copy of Dr. Fox's report to Brenda Sandwick ("Sandwick") in Andersen's human resources department and he personally delivered a copy to Rustad on May 5.  McLain Dep. at 72.

On May 10, 2006, Dr. Haley examined McLain and signed a report of work status stating that McLain was temporarily disabled from any occupation.  Jan. 15, 2008, Wilk Aff. Ex. 3.  Dr. Haley prohibited McLain from working until May 22.  Id. Ex. 3.

On May 22, 2006, McLain returned to work and asked Mathias not to schedule him for job-site deliveries because the increased angle of the truck ramp and the uneven surfaces caused

3

pain in his right knee.  McLain Dep. at 81-84.  Mathias responded that McLain would continue

to make job-site deliveries.  McLain Dep. at 82-84.  McLain continued to make job-site

deliveries and experienced pain in his right knee.

On May 25, 2006, McLain again consulted Dr. Haley.  Jan. 15, 2008, Wilk Aff. Ex. 4.

Dr. Haley issued a report of work status imposing restrictions on McLain's work for four weeks

starting May 22, 2006.  Jan. 15, 2008, Wilk Aff. Ex. 4.  Dr. Haley restricted McLain from lifting

more than twenty pounds and from repetitive walking.  Id. Ex. 4.  McLain faxed Dr. Haley's

report to Sandwick.  1st McLain Aff. [Docket No. 4] ¶ 40.  Beginning May 26, 2006, Andersen

placed McLain on short term disability leave.  Id. ¶ 44.

On June 19, 2006, Dr. Haley restricted McLain from returning to work until July 10.  Jan.

15, 2008, Wilk Aff. Ex. 5.  McLain remained on short term disability leave.

On July 10, 2006, McLain returned to work.  McLain Dep. at 84.  Mathias refused

McLain's renewed request that he not be scheduled for job-site deliveries.  1st McLain Aff.

¶¶ 45-46.  On August 3, 2006, McLain told French that the change to Class A truck delivery at

Home Depot stores was a mistake and McLain requested that he not be scheduled to make job-

site deliveries.  French Dep. at 111; McLain Dep. at 86.  French denied McLain's request.

French Dep. at 111.  McLain also notified French that Mathias had used vulgar language in

March 2006, and that certain employees were improperly punching the time clock for other

employees.  French Dep. at 111, 115.[2]  McLain told French that Andersen's use of two trucks to

make a delivery to a single job site on August 2 was "pathetic."  French Dep. at 118.  McLain

---

[2] French investigated McLain's allegations regarding employees improperly punching the
time clock and determined there was no violation.  French Dep. at 114.

4

also stated that morale at Andersen's Brooklyn Park facility was bad.  French Dep. at 120.

French responded that other employees had complained about McLain's poor attitude and that

McLain could look for another job if he was unhappy at the Brooklyn Park facility.  Id. at 121,

123.  McLain responded that he "w[ould] leave on his terms when he is ready to leave and only

then."  Id. at 124.  McLain walked out of the meeting before French could respond.  Id.

      The following day, French explained to McLain that Andersen used two trucks to make

one delivery on August 2 because the deliveries would not fit on one truck.  French Dep. at 126.

French then talked about McLain's attitude and respect for others.  French Dep. at 126.  French

warned McLain that he must change his behavior and respect and obey his supervisors or

McLain would no longer work for Andersen.  Id.  During this meeting, McLain gave French a

December 11, 1987, report signed by Dr. Haley.  McLain Dep. at 86; Jan. 15, 2008, Wilk Aff.

Ex. 6.  The report listed August 23, 1985, as the date of injury, and it listed a three percent

impairment to the body.  Jan. 15, 2008, Wilk Aff. Ex. 6.  However, French refused to accept the

form because the patient name and address fields were blank.  French Dep. at 99; McLain Dep.

at 86; Jan. 15, 2008, Wilk Aff. Ex. 6.  French asked McLain "how could this be yours without

your name on it[?] . . . [T]his is a form that's how old and you've been an employee for how

many years and why would we not have known about this before?"  French Dep. at 100.

McLain responded that the form had not previously been relevant to his employment at

Andersen.  Id.  McLain continued to make job-site deliveries.  McLain Dep. at 87.

      On August 10, 2006, Dr. Haley examined McLain's knee and issued a report of work

status stating that McLain's knee pain was related to his 1985 injury.  Jan. 15, 2008, Wilk Aff.

Ex. 7.  Dr. Haley's report indicated McLain was "disabled permanently from [his] or any

occupation." Id. Ex. 7.  However, the report also stated McLain was able to work but he was

permanently restricted from making job-site deliveries.  Id. Ex. 7.  McLain faxed Dr. Haley's

report to Sandwick in Andersen's human resources department.  Id. Ex. 8.  Late in the afternoon

of August 10, Sandwick called McLain and asked him if he could do a run-off delivery on

August 11.  Id. Ex. 8.  Run-off deliveries are extra deliveries to lumberyards that are scheduled

when a delivery does not fit on a standard delivery truck.  French Dep. at 66.  McLain responded

that he could do a run-off delivery.  McLain Dep. at 91.  McLain completed run-off deliveries on

August 11, 14, and 15.  1st McLain Aff. ¶ 58.

Shortly after Andersen received Dr. Haley's August 10, 2006, report, French called

Human Resources Generalist James Olson ("Olson") and Case Manager Deborah Hauble

("Hauble") to discuss McLain's restrictions.  1st Olson Dep. (Jan. 15, 2008, Wilk Aff. Ex. 18) at

77-78; French Dep. at 129-30; Hauble Dep. (Jan. 15, 2008, Wilk Aff. Ex. 17) at 67.  French,

Olson, and Hauble were unsure whether McLain could safely perform his job given his

restrictions.  Hauble Dep. at 115; French Dep. at 132.  On the afternoon of August 15, French,

Sandwick, and Rustad met with McLain.  French Dep. at 130-33.  French asked for and McLain

provided the 1987 report listing the three percent permanent disability.  French Dep. at 130; 1st

McLain Aff. ¶ 62.  French instructed McLain not to report to work until Andersen clarified his

restrictions.  French Dep. at 132.

On August 16, 2006, Dr. Haley faxed Andersen a report of work ability.  Jan. 15, 2008,

Wilk Aff. Ex. 9.  Dr. Haley's report stated that: (1) McLain could rarely (defined as no more

than five percent of an eight-hour work day) squat or climb; and (2) McLain could occasionally

(defined as no more than thirty-three percent of an eight-hour work day) stand or walk.  Jan. 15,

2008, Wilk Aff. Ex. 9.  Dr. Haley commented that McLain "can drive" but he "cannot deliver to new home sites because of ramp angles and uneven surfaces." Id. Ex. 9.  After receiving the report, Hauble faxed Dr. Haley a list of follow-up questions to determine whether McLain's restrictions extended beyond new home sites.  Hauble Dep. at 85; Jan. 15, 2008, Wilk Aff. Ex. 11.  Dr. Haley responded that: (1) McLain could not tolerate increased ramp angles wherever they occur; (2) McLain could not use his truck ramp unless it was "horizontal or nearly so"; and (3) the term "uneven surfaces" on the August 16 report of work ability included "uneven loading docks, uneven walkways, uneven stairs, etc."  Jan. 15, 2008, Wilk Aff. Ex. 11.

Based on these restrictions, Mathias, French, Olson, and Hauble determined that McLain could not make deliveries because of the potential that a particular site would require use of the truck ramp at an angle or would present uneven surfaces.  Mathias Dep. at 60-61; French Dep. at 84-85; Hauble Dep. at 105-06.  On August 16, 2006, Olson told McLain not to report to work on August 17.  Feb. 11, 2008, Wilk Aff. [Docket No. 134] Ex. 41.  On August 17, Mathias told McLain not to report to work on August 18.  Id. Ex. 41.

In a letter dated August 18, 2006, McLain requested that Hauble initiate short term disability benefits.  Id. Ex. 41.  McLain also inquired about returning to work.  Id. Ex. 41.  In an August 21 letter, Hauble responded that McLain's restrictions precluded him from performing the essential functions of his position.  Id. Ex. 16.  Hauble notified McLain that he was eligible for short term disability benefits and that she would file for long term disability benefits.  Id. Ex. 16.  Hauble stated that she would "continue to explore return to work opportunities on an on-going basis" and that McLain should contact her every two weeks.  Jan. 15, 2008, Wilk Aff. Ex. 16.  Andersen ultimately approved McLain for short term disability benefit effective August 18,

2006.  As of that date, McLain had almost six months of short term disability benefits remaining.
1st Olson Dep. at 150-51.

By letter dated August 23, 2006, McLain urged that the restrictions imposed by Dr.
Haley did not prevent him from making deliveries to Home Depot stores and lumberyards.  1st
McLain Aff. Ex K.  McLain requested that Andersen accommodate his "disability" by allowing
him to do run-off routes.  Id. Ex. K.

In a letter of August 29, 2006, McLain asked Mathias about the availability of work that
would meet his restrictions.  1st McLain Aff. Ex. L.  Mathias responded that no such work was
available.  McLain Dep. at 115.  By late August 2006, McLain was aware of a slowdown in the
new home construction industry that was affecting Andersen's business.  Id. at 115-16.

In an August 31, 2006, letter, McLain asked Hauble to explain her conclusion that his
restrictions precluded him from performing the essential functions of his job.  1st McLain Aff.
Ex. M.  In a separate August 31, 2006, letter to Olson and Hauble, McLain asserted Andersen
was discriminating against him "on the basis of disability, gender, and age.  This includes what,
thus far, has been a refusal to accommodate my request [to drive run-off routes].  I also believe
that my disability . . . has been used by my supervisors against me for complaining about
company policy and practices and for requesting accommodation."  Feb. 11, 2008, Wilk Aff. Ex.
42.

In a September 7, 2006, letter, Hauble acknowledged receipt of McLain's August 18 and
August 31 letters.  1st McLain Aff. Ex. O.  Hauble reiterated that McLain could not perform the
essential functions of his job because of his restrictions.  Id. Ex. O.  Hauble stated Andersen did
not have work available within McLain's restrictions.  Id. Ex. O.  Hauble informed McLain that

she would contact him by phone if work became available.  Id. Ex. O.

On September 11, 2006, McLain faxed Hauble a September 5, 2006, letter from Dr. Fox and a September 8, 2006, letter from Dr. Haley.  Id. Exs. Q-S.  Dr. Fox wrote that McLain "tolerates more consistent sites" such as Home Depot stores and other sites with loading docks. Id. Ex. Q.  Dr. Haley reached a similar conclusion:

> [McLain] tolerates the use of loading docks at places like Home Depot, lumberyards and the like.  Where the problem arises is job sites where loading and unloading areas are improvised, irregular in contour and the like. Consequently, he and Dr. Fox and I are hoping that you will be able to accommodate a situation that I have just described where he can deliver to places which have more permanent and standardized loading and unloading areas. . . .  I know terms [such as] regular and the like are open to interpretation but I am hoping I am getting my point across to you.

Id. Ex. R.

On September 12, 2006, Olson reiterated to McLain that he could not safely perform his job duties.  Id. ¶ 121.  McLain complained that Andersen had accommodated other employees in the past.  Id. Ex. T.  Olson responded that Andersen accommodated the other employees because other jobs were available for them, whereas Andersen did not have any jobs available that met McLain's restrictions.  Id. Ex. T.

On September 15, 2006, Olson informed McLain that a Class A truck run to Iowa might satisfy his restrictions because it was "mostly driving."  Id. ¶ 136, Ex. U.  Later that day, McLain wrote a letter to Olson and Hauble requesting that Hauble identify in writing the jobs she thought McLain was qualified for.  Id. Ex. T.

In a September 20, 2006, letter, Olson notified McLain that Mathias denied using a profanity in his March 2006 conversation with McLain about the scheduling changes.  Id. Ex. U. Olson stated that he had reiterated with both Mathias and French that the use of profanity in the

9

workplace was unprofessional and unnecessary.  Id. Ex. U.  Regarding McLain's allegation of

discrimination, Olson stated that "unfortunately Andersen can't always reasonably accommodate

every medical condition and while some associates with restrictions have returned to work,

others have not."  Id. Ex. U.  Finally, Olson confirmed that a truck run to Iowa might work with

McLain's medical restrictions, but McLain would need to upgrade to a Class A driver's license.

Id. Ex. U.

In a September 21, 2006, letter, Hauble explained to Dr. Fox and Dr. Haley that despite

their respective September 5 and September 8 letters, she had concluded that McLain could not

perform the essential functions of his "Driver/Warehouse Associate I" position:

> Considering Mr. McLain's primary job duties involve driving and
> frequent deliveries, it is unreasonable to accommodate his restriction of "No Job
> site Deliveries."  Based on our On-Site Job Analysis, for the Driver/Warehouse I
> position, essential functions include[:] frequent standing, walking, very heavy
> lifting, pushing and pulling and occasional squatting and climbing.  Our drivers
> often stand and walk 35 to 75% of their shift.  As a result, Mr. McLain's
> permanent restrictions preclude him from performing one or more of the essential
> functions of the Driver/Warehouse I position.

Id. Ex. V.[3]  Hauble stated that she would continue to explore alternative job options that matched

McLain's physical capabilities.  Id. Ex. V.

On September 29, 2006, McLain faxed to Hauble a cover letter attaching September 28,

2006, medical reports in which Drs. Fox and Haley revised their restrictions.  Id. Exs. W-Y.  Dr.

Fox reported that McLain could occasionally squat and frequently (up to sixty-six percent of an

---

[3] Hauble's reference to the on-site job analysis refers to an analysis performed by Olson,
French, and Mathias of time records to determine how many, if any, delivery routes complied
with McLain's restrictions.  French Dep. at 152; Mathias Dep. at 90; Hauble Dep. at 159; 1st
Olson Dep. at 119-20.  Hauble testified that they did not find a route that satisfied McLain's
restrictions.  Hauble Dep. at 46.

eight-hour work day) bend, twist, climb, drive, sit, stand, walk, push, pull, reach over his

shoulder, and reach to his front and side.  Id. Ex. W.  Dr. Haley's report stated that McLain could

occasionally squat and climb, and he could frequently stand and walk.  Id. Ex. X.  Both doctors

noted that McLain still could not do job-site deliveries.  Id. Exs. W-X.  McLain's cover letter

noted that "[b]oth of my doctors say that I am able to return to work as a truck driver, delivering

to Home Depot, to lumber yards, and to complete run-off deliveries, as I had done well for over

8 years."  Id. Ex. Y.  McLain also requested "all the job descriptions for Andersen employees

working in Minnesota."  Id. Ex. Y.

Hauble reviewed Dr. Fox's and Dr. Haley's September 28, 2006, reports and concluded

that McLain still could not perform job-site deliveries, which Olson, French, and Mathias

considered an essential function of McLain's position.  Hauble Dep. at 187.  Hauble testified that

because she did not have access to all of Andersen's job descriptions, she relied on Olson to

provide the descriptions to McLain.  Hauble Dep. at 216-17.  Olson testified that Hauble never

asked him to send job descriptions to McLain.  1st Olson Dep. at 42-43.  Neither Olson nor

Hauble ever sent job descriptions to McLain.

On September 29, 2006, McLain contacted Mathias and Hauble to discuss the possibility

of on-the-job training for a Class A license.  McLain Dep. at 136-37.  McLain, who had obtained

his Class A learner's permit on September 7, 2006, explained that he believed Andersen had

provided on-the-job training for other employees.  1st McLain Aff. ¶¶ 155-160, 165.  Mathias

said he would discuss on the-job-training with French.  Id. ¶ 161.

On October 2, 2006, Hauble asked McLain for an updated resume.  McLain Dep. at 138.

Prior to that time, Hauble had focused exclusively on finding truck-driving work for McLain

because "McLain kept telling [her] he wanted to go back to work as a truck driver."  Hauble

Dep. at 194.  Based on McLain's inquiries in late September regarding the availability of other

positions, and based on the decrease in demand for Andersen's products, Hauble expanded her

search to encompass other jobs at Andersen.  Id.  Hauble regularly reviewed Andersen's intranet

for job postings of suitable positions, but she never found an open position that she thought

McLain would qualify for.  Hauble Dep. at 26.  Hauble explored the possibility of "cross

training" McLain to work at a different position, but French, Olson, and Mathias reported that no

openings were available in other positions.  Hauble Dep. at 147.

On October 6, 2006, Mathias informed McLain that Andersen required its drivers to go to

training school to obtain a Class A license.  McLain Dep. at 139-40; Jan. 15, 2008, Wilk Aff. Ex.

28.  On October 10, 2006, Olson called McLain to discuss arranging a conference call between

Olson, Hauble, Hauble's supervisor, French, and McLain to discuss possible jobs and review

McLain's restrictions.  McLain Dep. at 142; Jan. 15, 2008, Wilk Aff. Ex. 28.  On October 11,

Mathias informed McLain that Olson had obtained the information regarding the Class A

training program.  McLain Dep. at 143.

On October 13, 2006, Olson called McLain to discuss suitable times for the meeting.

Jan. 15, 2008, Wilk Aff. Ex. 31.  McLain informed Olson that he had filed the instant lawsuit

and that Olson should speak to Andersen's attorneys.  Jan. 15, 2008, Wilk Aff. Ex. 31.  Olson

and McLain did not discuss setting up the conference call.  McLain Dep. at 146-48; Jan. 15,

2008, Wilk Aff. Ex. 31.

In a letter of October 19, 2006, McLain inquired whether Andersen would provide on-

the-job training for a Class A license.  Jan. 15, 2008, Wilk Aff. Ex. 32.  In a November 6, 2006,

letter, Olson stated that under Andersen's fleet guidelines, McLain would need to successfully complete a training program at a local school.  Olson Aff. [Docket No. 12] Ex. 1.  Olson noted that Andersen would likely reimburse McLain's tuition for such a program.  Id.  Olson cautioned McLain that there was no guarantee that Andersen would have a job for him even if he obtained his Class A license.  Id.  McLain's return to work "would depend on available work and any restrictions that you have."  Id.

At a November 22, 2006, meeting, Olson and French placed McLain on on-call status. McLain Dep. at 155; 1st Olson Dep. at 138-39; 2d Olson Dep. (Jan. 15, 2008, Wilk Aff. Ex. 24) at 126-27.  Olson and French stated that they did not have any driving positions that satisfied McLain's medical restrictions.  1st Olson Dep. at 140-41.  Olson and French also told McLain that they did not have an open warehouse position.  Id.  Olson provided McLain with a copy of Andersen's fleet guidelines, which required a driver to attend formal training classes before driving a Class A truck at Andersen.  1st Olson Dep. at 171; Feb. 19, 2008, Wilk Aff. [Docket No. 140] Ex. 47.  Olson and French stated that if a conflict arose between attendance at classes for a Class A license and available work at Andersen, McLain would be expected to miss class and come to work.  1st Olson Dep. at 140-41.

In a December 6, 2006, letter to Olson, McLain stated that Dakota County Technical College in Rosemount, Minnesota, offered a day class and a night class.  Jan. 15, 2008, Wilk Aff. Ex. 36.  McLain explained that the sixteen-week night program, which consisted of four-hour classes beginning at 5:00 p.m. on weekdays, was impractical because if Andersen had work for him, he could not return his truck to the Brooklyn Park facility and arrive in time for

mandatory class sessions.  Id. Ex. 36.[4]  McLain also stated that "it would be too difficult to work a full day and attend class at night."  Id. Ex. 36.  McLain's letter also discussed an eight-week day class beginning on January 8, 2007.  Id. Ex. 36.  McLain asked that Andersen place him on paid leave while he attended day class.  Id. Ex. 36.

In a December 11, 2006, letter, Olson responded that Andersen "does not have a program that pays regular wages while an associate[] attends classes [of] this sort."  Id. Ex. 37.  Olson testified that Andersen has never paid wages or short term disability benefits to employees who are not available for work because they are in school.  1st Olson Dep. at 156-57.

In letters dated December 15 and 22, 2006, McLain repeated his request that Andersen agree not to call him into work if he signed up for the day class.  Id. at 155, 161-62.  By letter dated January 2, 2007, Olson stated that McLain could take an unpaid leave of absence if he wished to take the day class.  Id. at 164-65.  Olson asserted that "[t]he entire time you have been on short-term disability, since late summer, you have been free to sign up for one of the programs needed to advance your skills."  Id. at 164.

In a letter dated January 8, 2007, McLain responded that November 22, 2006, was the first time that anyone at Andersen told him that he would need to take a training course to obtain his Class A license.  Id. at 166-68.  McLain explained that he had decided not to register for the day class because he could not risk losing his tuition payment if Andersen required him to miss class and report to work.  Id. at 168-69.  McLain also stated that he could not take an unpaid leave of absence because he would not have any income while his short term disability benefits

---

[4] Olson testified that he, French, and Mathias had told McLain that if work became available for him, they would try to manage McLain's schedule so that he could attend the night class.  2d Olson Dep. at 144-45.  McLain does not recall such a discussion.  McLain Dep. at 160.

were suspended.  Id. at 169.  McLain concluded by stating that "[u]nder either plan there is no guarantee that work would be available to me or that my tuition would be reimbursed.  That is another reason why I did not register for the course beginning today."  Id.

On January 18, 2007, McLain told Olson that Andersen's insurance carrier denied his claim for long term disability benefits.  1st Olson Dep. at 174.  Olson responded that he hoped Andersen could return McLain to work before his short term disability benefits ended in February.  Id. at 174-75.  McLain asked for information regarding the inception of Andersen's fleet guidelines.  Jan. 15, 2008, Wilk Aff. Ex. 34.  Olson responded that he believed the fleet guidelines came out in the fall of 2006.  Id. Ex. 34.

In a February 7, 2007, letter, Olson repeated the information he provided McLain during their January 18 conversation.  Jan. 15, 2008, Wilk Aff. Ex. 34.  Olson also informed McLain that under Andersen's disability protection program, "if you have exhausted your STD and your LTD claim has been denied, the associate is eligible to continue on a leave for up to two months while he/she attempts to return to work or appeal the LTD claim."  Id. Ex. 34.  At the end of the two months, Andersen would terminate McLain's employment.  1st Olson Dep. at 176.

McLain's short term disability benefits ended on February 12, 2007.  1st Olson Dep. at 178.  On February 15, McLain requested that he be placed on leave.  Jan. 15, 2008, Wilk Aff. Ex. 30.  Olson granted McLain's request.  Id. Ex. 30.  Olson and McLain discussed that Andersen would make a reasonable accommodation for McLain if it could do so.  Id. Ex. 30.  Olson informed McLain that Andersen was laying off employees and there were no open or regular positions available at Andersen's Brooklyn Park facility.  Id. Ex. 30.  Olson and McLain agreed that McLain would remain on an on-call status, and he would call Mathias on the first of

15

each month to inquire about available work.  Id. Ex. 30.

In an April 12, 2007, phone conversation, French, Mathias, Hauble, and Olson discussed whether work would be available for McLain in the foreseeable future.  Id. Exs. 38-39.  French and Mathias stated that they did not foresee that any work would be available for McLain.  Id. French and Mathias reported that they could not make a reasonable accommodation for McLain without terminating another employee.  Id. Ex. 39.  In a letter dated April 17, 2007, Olson informed McLain that Andersen was terminating his employment because two months had elapsed since his benefits expired, and Andersen still did not have available positions within McLain's restrictions.  Id. Ex. 35.

**B.     Procedural History**

On October 13, 2006, McLain filed this litigation in state court.  His initial Complaint asserted claims under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. Ch. 363A, for failure to accommodate, interference with age and pension benefits, age discrimination, sex discrimination, disability discrimination, and discriminatory reprisal.  McLain also asserted a claim of common law misrepresentation.

On November 2, 2006, Andersen removed McLain's action to federal court under 28 U.S.C. § 1441 alleging that McLain's claim of interference with age and pension benefits was completely preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  Notice of Removal [Docket No. 1].  Andersen asserted this Court had federal question jurisdiction under 28 U.S.C. § 1331 over McLain's ERISA claim, and supplemental jurisdiction under 28 U.S.C. § 1367 over McLain's other claims.  McLain did not oppose removal of the action to federal court on the basis of federal question jurisdiction.

16

On November 16, 2006, the Court denied McLain's Amended Motion for a Preliminary Injunction [Docket No. 5] ordering Andersen to return him to work.

On March 6, 2007, the Court granted Andersen's Motion for Partial Summary Judgment [Docket No. 24] on McLain's failure-to-accommodate claim.  Mar. 6, 2007, Order [Docket No. 37].  The Court determined that McLain's failure-to-accommodate claim failed as a matter of law because he conceded he is not actually disabled under the MHRA.  Compl. ¶ 21; Nov. 16, 2006, Hrg. Tr. [Docket No. 23] at 11-12.

On May 15, 2007, McLain filed an Amended Complaint [Docket No. 64] omitting the ERISA-preempted claim of interference with pension benefits.  On June 19, approximately a month and a half before the then-applicable discovery deadline, McLain moved to remand this matter to state court.  Pl.'s Mot. to Remand [Docket No. 67]; 1st Am. Pretrial Sched. Order [Docket No. 56].  On July 19, the Court denied McLain's Motion to Remand.  July 19, 2007, Hrg. Tr. [Docket No. 91] at 21-24.  The Court determined that remand was discretionary under 28 U.S.C. § 1367(c)(3), and that the mandatory remand provision of 28 U.S.C. § 1447(c) did not apply.  Id.  Given the advanced posture of the litigation, judicial economy was best served by retaining jurisdiction in federal court.  Id.

### III. DISCUSSION

**A.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.    McLain's Remaining Claims**

This Court has previously dismissed McLain's MHRA failure-to-accommodate claim, which is asserted in Count One of the Amended Complaint.  McLain concedes that Andersen should be granted summary judgment on the MHRA sex and age discrimination claims asserted in Counts Two and Three of his Amended Complaint.  Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [Docket No. 137] at 1 n.1.  McLain's remaining claims are disability discrimination and discriminatory reprisal under the MHRA, and misrepresentation under Minnesota common law.

**1.    Disability Discrimination**

The MHRA provides that "[e]xcept when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of . . . disability to . . . discharge an employee; or discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."  Minn. Stat. § 363A.08, subd. 2.  A person is disabled within the meaning of the MHRA if he "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  Minn.

18

Stat. § 363A.03, subd. 12.  As discussed above, early in this litigation McLain concedes he does not have an impairment that materially limits a major life activity.  Additionally, McLain does not argue that he has a record of such an impairment.  Mem. in Opp'n to Def.'s Mot. for Summ. J. [Docket No. 137] at 17-20.  Thus, McLain is asserting solely a "regarded as" claim.

The parties agree that McLain's disability discrimination claim should be analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To establish a prima facie case of disability discrimination, McLain must show that: (1) he was disabled within the meaning of the MHRA; (2) he was qualified to perform the essential functions of his job, with or without a reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.  Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997).  If McLain establishes a prima facie case, the burden of production shifts to Andersen to articulate a legitimate, nondiscriminatory reason for its actions.  Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999).  Once Andersen has done so, the burden shifts back to McLain to present evidence that Andersen's legitimate nondiscriminatory reason is mere pretext.  Id.  The Court may look to federal case law under the ADA because courts analyze ADA and MHRA claims under the same standard.  Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784, 788 (8th Cir. 2004); Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711 n.5 (8th Cir. 2003).

To show that Andersen regarded him as disabled, McLain must present evidence that Andersen mistakenly believed that his knee injury substantially limits at least one major life activity.  Sutton v. United Airlines, 527 U.S. 471, 489 (1999).  McLain argues that Andersen's decision to place him on short term disability leave in August 2006 demonstrates that Andersen

19

mistakenly believed his knee injury substantially limited his major life activity of working.  Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 19.  McLain also argues that Andersen "did not take into account that McLain was capable of doing many jobs" at Andersen's Brooklyn Park facility, such as working in the shop and in the warehouse.  Id. at 17.

"To be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999).  A plaintiff must demonstrate that his employer regarded him as unable to work in a broad class of jobs.  Knutson v. Ag Processing, Inc., 394 F.3d 1047, 1052 (8th Cir. 2005).  Measured against this standard, McLain's "regarded as" claim fails as a matter of law.

Andersen determined that McLain's medical restrictions precluded him from performing his specific Class B driving job, which required deliveries to lumberyards and job sites.  McLain does not cite any evidence that Andersen viewed him as unable to perform a broad class of driving jobs or manual labor.  Moreover, the record reflects that Olson and others at Andersen believed McLain could perform delivery jobs that were "mostly driving," such as the Class A truck run to Iowa.

Similarly, McLain's assertion that Andersen "did not take into account that [he] was capable of doing many jobs" does not support his "regarded as" claim.  Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 17.  The evidence demonstrates that Andersen did not have any job openings at the Brooklyn Park facility from August 2006 until McLain was terminated in April 2007.  In December 2006, Andersen's manufacturing facility laid off 400 employees.  1st Olson Dep. at 190.  By March 2007, Andersen reduced its number of Class B trucks from seven to five,

and Andersen's Brooklyn Park facility had temporarily laid off seven of its fourteen shop employees, ten of its twenty-four warehouse employees, and five of its fifteen drivers (including McLain). Mathias Dep. at 146-47; French Dep. at 13, 25-26. Andersen's failure to consider McLain for filled positions is not evidence that Andersen regarded McLain as incapable of performing those positions or a broad class of positions. McLain's prima facie case fails because he cannot show he was disabled as defined by the MHRA. Andersen's Motion for Summary Judgment on McLain's disability discrimination claim is granted.

Assuming McLain could demonstrate a genuine issue of material fact concerning whether Andersen regarded him as disabled, his "regarded as" claim still fails as a matter of law. On August 15, 2006, McLain could not perform his Class B driving duties at Andersen unless Andersen accommodated him by giving him work that did not include job-site deliveries. Absent a duty to make a reasonable accommodation, Andersen did not violate the MHRA when it placed McLain on disability leave and eventually terminated him because he could not perform his job duties. See Weber v. Strippit, Inc., 186 F.3d 907, 910, 915-18 (8th Cir. 1999) (affirming summary judgment for employer where employee who was regarded as disabled was denied an accommodation and was terminated).

Arguing against this result, McLain contends that job-site deliveries were not an essential function of his job at Andersen. However, the testimony is uncontroverted that Andersen required its Class B drivers to make deliveries to job sites. Olson, Hauble, French, and Mathias all testified that Andersen expected Class B drivers to make job-site deliveries. 1st Olson Dep. at 67-68; Hauble Dep. at 31, 36; French Dep. at 87; Mathias Dep. at 155-56. Gary Solseth, another Class B driver at Andersen's Brooklyn Park facility, testified that job-site deliveries

were one of his job duties.  Solseth Dep. (Jan. 15, 2008, Wilk Aff. Ex 21) at 22, 73.  Kenneth

Snyder and Michael Jackson, two of Andersen's Class A drivers, also testified that their jobs

require them to deliver to job sites.  Snyder Dep. (Jan. 15, 2008, Wilk Aff. Ex. 22) at 148;

Jackson Dep. (Jan. 15, 2008, Wilk Aff. Ex. 19) at 29, 81.

    In support of his argument that job-site deliveries were not an essential function, McLain

asserts that Andersen's job description for a Commercial Vehicle Driver "does not include any

reference that job-site deliveries are an essential function of the job."  Pl.'s Reply Mem. in Supp.

of Partial Mot. for Summ. J. [Docket No. 144] at 3.  However, the job description contradicts

McLain's argument because it states the job is "[t]o transport and deliver freight by driving

gasoline or diesel powered tractor-trailer combinations.  Destinations may include dealers,

distribution centers, *and construction job sites*."  Feb. 19, 2008, Wilk Aff. Ex. 47 at 3 (emphasis

added).

    McLain also avers that "[b]ased on information and belief, truck driver Dan [Farrand] has

not made job site deliveries for many months, after requesting that he be taken off job site

deliveries."  5th McLain Aff. [Docket No. 136] ¶ 8.  In response, Andersen relies on Mathias's

declaration, which states that "certain Class A drivers may not be required to make job site

deliveries depending upon their route and economic conditions.  In today's market, Class A

drivers make job site deliveries.  I . . . have personal knowledge that Mr. Farrand—despite being

a Class A driver—has regularly made job site deliveries."  Mathias Decl. [Docket No. 142] ¶ 3.

McLain offers no evidence that contradicts Mathias's declaration, which is based on personal

knowledge.

    In summary, Andersen required its drivers to make deliveries to lumberyards and job

22

sites as needed.  Although McLain's route prior to March 2006 rarely included job-site

deliveries, Andersen made a business decision to deliver with larger trucks to certain locations.

As a result, Andersen scheduled McLain for more job-site deliveries, which he was medically

unable to perform.  Even if Andersen regarded McLain as disabled, it did not have a duty to

accommodate McLain by modifying his delivery route to avoid job sites.  Therefore, Andersen

cannot be liable under the MHRA for placing McLain on disability leave and terminating him

after he could no longer perform his job.

### 2.    Discriminatory Reprisal

Both McLain and Andersen seek summary judgment on McLain's discriminatory reprisal

claim.  Minn. Stat. § 363A.15 prohibits an employer from intentionally engaging in a reprisal

against an employee who opposed a practice forbidden by the MHRA.  The parties agree that

McLain's discriminatory reprisal claim should also be analyzed under McDonnell Douglas

framework.  To establish a prima facie case of reprisal, an employee must adduce evidence of:

(1) statutorily-protected conduct by the employee; (2) adverse employment action by the

employer; and (3) a causal connection between the two."  Fletcher v. St. Paul Pioneer Press, 589

N.W.2d 96, 101-02 (Minn. 1999).

Regarding the first prong of McLain's prima facie case, the parties do not dispute that

McLain engaged in statutorily protected conduct beginning on May 22, 2006 and continuing

through April 2007 when he repeatedly requested a reasonable accommodation for his knee

injury.  Additionally, it is undisputed that the MHRA's anti-retaliation provision protected

McLain when he wrote the August 31, 2006, letter and filed his October 13, 2006, Complaint

asserting unlawful discrimination by Andersen.

That termination of McLain's employment in April 2007 constitutes an adverse employment action is uncontested.  McLain also claims he suffered two other adverse employment actions: (1) Andersen sent him home from work on August 15, 2006, and placed him on short term disability leave; and (2) Andersen did not accommodate his knee injury.  Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [Docket No. 130] at 14.  For the purposes of the parties' cross-summary judgment motions on McLain's retaliation claim, Andersen's decision to send McLain home from work and Andersen's decision not to accommodate McLain's injury will be treated as adverse actions.

Whether McLain can establish a prima facie case of retaliation turns on demonstrating a causal connection between his protected activity and the adverse actions.  McLain argues the temporal proximity between his first request for accommodation, made on May 22, 2006, and Andersen's August 15, 2006, decision to send him home creates an issue of fact as to whether being sent home was causally connected to his request for accommodation.  However, McLain's argument is fatally undermined by Andersen's continuing to give McLain work in May, July, and early August 2006 even after he repeatedly requested an accommodation in his delivery route.  Andersen sent McLain home on August 15 only after it learned from Dr. Haley's August 10 report that McLain could not safely perform job-site deliveries.  On this record, McLain cannot demonstrate that Andersen's decision to send him home in August 2006 was retaliation against him for requesting an accommodation.

McLain next argues that Andersen decided not to accommodate him in retaliation for his

complaints of discrimination on August 31, 2006.[5]  McLain seems to assert that the temporal proximity between his allegations of discrimination and Andersen's refusal to accommodate him supports an inference of retaliatory intent.  To the extent McLain's retaliation claim is premised on Andersen's refusal to modify his delivery route to avoid job-site deliveries, McLain's retaliation claim fails as a matter of law because Andersen denied his request before McLain complained of discrimination.  Mathias refused McLain's request for a modification to his delivery schedule on May 22, 2006, and French refused McLain's request on August 3, 2006.  McLain did not complain of discrimination until August 31, 2006.  Accordingly, McLain cannot rely on temporal proximity to argue that Andersen retaliated against him by refusing to modify his delivery schedule.

McLain also argues Andersen had a customary employment practice of accommodating similarly situated employees who did not complain of discrimination by reassigning them to other jobs.  McLain proffers evidence that Andersen reassigned two drivers, Michael Vaughn ("Vaughn") and Terry Skare, to positions as unloaders when they were restricted from driving. After Vaughn lost his truck license for a year due to a DWI in February 2001, Andersen reassigned him new duties.  Vaughn Dep. (Jan. 15, 2008, Wilk Aff. Ex. 23) at 18, 64.  Andersen reassigned Terry Skare in 2005 when his seizure medication restricted him from driving.  French Dep. at 198-200; J. Skare Dep. (Feb. 11, 2008, Wilk Aff. Ex. 40) at 53-54.  McLain also argues that Andersen routinely provided cross-training for its employees, and that its failure to allow

---

[5] If McLain is instead arguing that Andersen's refusal to accommodate him was retaliation for requesting an accommodation, that argument fails to state a retaliation claim. McLain cannot resurrect his dismissed failure-to-accommodate claim by labeling it as a retaliation claim.

him to cross-train while he was on disability leave supports an inference of retaliatory intent.

Assuming arguendo that this evidence establishes McLain's prima facie case, McLain still cannot prevail on his retaliation claim.  Andersen has articulated a legitimate, non-discriminatory reason for not reassigning or cross-training McLain: it did not have any open positions.  Although Andersen found alternate work for Vaughn in 2001 and Terry Skare in 2005, Andersen experienced a downturn in 2006 and early 2007, during the time that McLain was on disability leave.  As discussed above, the evidence conclusively demonstrates that Andersen did not have vacant positions from August 2006 to April 2007.

McLain argues Andersen's reason for not reassigning or cross-training him is pretextual. McLain alleges Andersen failed to inform him of a cross-training opportunity in the shipping office that arose in December 2006 when an employee was terminated.  Mathias Dep. at 71. However, the evidence reflects that Andersen did not hire anyone to fill the position full time. Instead, Andersen directed John Skare, who was working in the warehouse, to cross-train as needed in the shipping office.  2d Olson Dep. at 174-75.  In early 2007, Skare trained in the shipping office a few hours per week.  French Dep. at 182-84.  Andersen's failure to notify McLain of a position it did not fill does not support a finding of pretext.

McLain's argument that Andersen terminated his employment because he complained of discrimination fails for similar reasons.  Again, McLain has not adduced any evidence of vacant positions to which he could have been reassigned.  Accordingly, McLain cannot demonstrate that Andersen's asserted reason for terminating him—that there were no vacant positions—is pretextual.

McLain's other arguments in support of his reprisal claim merit little discussion.  McLain

argues that Andersen allowed Derrick Wills ("Wills"), a Brooklyn Park employee, to attend Class A driving classes in January 2007 but imposed obstacles when McLain attempted to do so. Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. at 14-15.  However, Wills attended classes while he was on a voluntary lay-off period.  Id. at 15.  Wills did not receive any pay while he was on lay-off.  Andersen offered a similar unpaid leave of absence to McLain. Therefore, McLain's argument regarding Wills provides no support for a retaliation claim.

McLain's argues Andersen committed a per se violation of the MHRA because it only considered him for reassignment to vacant positions.  Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. at 19-20.  However, this Court has already held that Andersen had no duty to accommodate McLain.  Therefore, Andersen did not have a duty to consider job restructuring, modified work schedules, or the other examples of reasonable accommodations listed in Minn. Stat. § 363A.08, subd. 6.

The Court grants Andersen's Motion for Summary Judgment on McLain's discriminatory reprisal claim, and denies McLain's Motion for Partial Summary Judgment.

### 3.    Misrepresentation

Under Minnesota law, the threshold for a claim of fraudulent misrepresentation is high. Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000).  McLain must establish:

> [A] false representation of past or present material fact that is susceptible to knowledge; the representor knew the fact was false or asserted it as her own knowledge without knowing whether it was true or false; the representor intended that the plaintiff act on the statement; the plaintiff, in fact, acted in justifiable reliance on the statement; the plaintiff suffered damage; and the statement was the proximate cause of this damage.

Piekarski v. Home Owners Savings Bank, F.S.B., 956 F.2d 1484, 1493 (8th Cir. 1992).

In his Amended Complaint, McLain alleges Andersen misrepresented that it was "seeking to find other job opportunities for [his] continued employment." Am. Compl. ¶ 216. Andersen argues McLain has no evidence to support this allegation. This Court agrees. Both Hauble and Olson testified they regularly reviewed whether Andersen had jobs available for McLain. Hauble Dep. at 21; 1st Olson Dep. at 55; 2d Olson Dep. at 36. McLain does not offer any evidence to the contrary.

McLain responds by offering additional misrepresentations not alleged in the Amended Complaint. Putting this deficiency aside, McLain's fraudulent misrepresentation claim still fails as a matter of law. One of McLain's allegations is that Andersen promulgated its requirement that drivers go to an outside school for their Class A license specifically to prevent McLain from receiving on-the-job training. However, although Olson stated the fleet guidelines were promulgated in the fall of 2006, the fleet guidelines themselves reflect that Olson was mistaken. Andersen's senior managers signed the fleet guidelines in April 2006, well before McLain sought Class A training. Feb. 19, 2008, Wilk Aff. Ex. 47 at 11.

McLain also argues that Andersen committed a misrepresentation by failing to disclose the fleet guidelines until November 22, 2006. McLain first inquired about on-the-job training on September 29, 2006. There is some evidence that Olson was prepared to discuss Andersen's Class A requirements when they spoke on October 13, 2006, to set up a meeting. Both McLain and Olson testified the conversation ended abruptly when McLain informed Olson of this lawsuit and stated that Olson should speak to Andersen's lawyers. Olson testified he understand McLain was suggesting they communicate through their attorneys. 1st Olson Dep. at 132-33. Olson's November 6, 2006, letter provides contemporaneous corroboration of Olson's testimony. Olson

28

Aff. Ex. 1.  Although McLain disputes Olson's account, he concedes that both he and Olson failed to pursue scheduling the conference call in their October 13, 2006, conversation.  McLain Dep. at 148.  On this record, McLain cannot demonstrate that Andersen intentionally delayed providing him the fleet guidelines.

Even assuming arguendo that Andersen intentionally withheld its fleet guidelines, McLain does not provide any evidence that he changed his position and suffered damages as a result of Andersen's approximately two-month delay in disclosing its guidelines.  Therefore, the Court grants Andersen's Motion for Summary Judgment on McLain's fraudulent misrepresentation claim.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendants Andersen Corporation and Andersen Distribution, Inc.'s Motion for

Summary Judgment [Docket No. 78] is **GRANTED**; and

2.      Plaintiff Kerry McLain's Motion for Partial Summary Judgment [Docket No.

128] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


BY THE COURT:

s/Ann D. Montgomery

_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 2, 2008